# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
FLOR, POND, and ARGUELLES[1]
Appellate Military Judges

**UNITED STATES, Appellee**
v.
**Inmate JOHN T. LONG**
**United States Army, Appellant**

ARMY 20240334

Headquarters, U.S. Army Combined Arms Center and Fort Leavenworth
Scott A. Oravec, Military Judge
Colonel Robert L. Manley III, Staff Judge Advocate

For Appellant: Colonel Frank E. Kostik, Jr., JA; Lieutenant Colonel Kyle C. Sprague, JA; Major Peter M. Ellis, JA; Captain Andrew W. Moore, JA (on brief).

For Appellee: No brief filed.

19 March 2026

------------------------------------
MEMORANDUM OPINION
------------------------------------

*This opinion is issued as an unpublished opinion and, as such, does not serve as precedent.*

POND, Senior Judge:

A military judge sitting as a general court-martial convicted appellant, consistent with his pleas, of two specifications of assault upon a person in the execution of law enforcement duties, in violation of Article 128, Uniform Code of Military Justice, 10 U.S.C. § 928 [UCMJ]. Consistent with the plea agreement, the military judge sentenced appellant to confinement for 120 days.[2]

_____

[1] Judge ARGUELLES took final action in this case while on active duty.

[2] The military judge sentenced appellant to 120 days of confinement for Specification 1 of The Charge to be served concurrently with 90 days of confinement for Specification 2 of The Charge. Appellant was credited with 64 days of confinement credit.

Before this court, appellant argues the military judge erred in accepting his plea of guilty to the assault in Specification 1 of The Charge because the military judge failed to adequately resolve whether appellant was acting in self-defense. Appellant argues this unresolved inconsistency rendered his guilty plea improvident and requests this court set aside the conviction and sentence for Specification 1 of The Charge. For the reasons discussed below, we disagree and affirm the findings and sentence.[3]

## BACKGROUND

Appellant is an inmate confined at the United States Disciplinary Barracks on Fort Leavenworth, Kansas. As an inmate, appellant was subject to a routine frisk after leaving the dining facility on 19 May 2023. During the frisk, a correctional specialist repeatedly ordered appellant to open his hands, an order that appellant disobeyed. Instead, appellant walked briskly towards the nearby latrine. The correctional specialist attempted to prevent appellant from entering the latrine by blocking the door. Appellant, noticing this, used force to open the door, causing the door to strike the correctional specialist's foot. This conduct formed the basis for the assault in Specification 2 of The Charge, which is not at issue on appeal.

Appellant then walked into the latrine and the correctional specialist pressed the duress button, summoning the correctional officer on duty, a First Lieutenant, who quickly responded to the alarm. Appellant was standing at a toilet when the correctional officer entered the latrine and approached appellant from behind. The correctional officer attempted to restrain appellant's hands, to which appellant replied, "my d*** is out!" In response, the correctional officer placed one hand on appellant's neck and right shoulder area. Appellant then spun around, striking the correctional officer on the face with his arm, concussing the correctional officer. The appellant then walked out of the latrine and stated, "I will walk myself to the SHU [special housing unit]." This conduct formed the basis for the assault in Specification 1 of The Charge, which appellant now challenges on appeal, arguing his plea of guilty was improvident.

---

[3] We have also considered the matters personally raised by appellant pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982), and find them to be without merit. We also note that one of appellant's trial defense counsel, who was not present at the arraignment, never announced his detailing and qualifications on the record. We find such omission, however, to be harmless error. *See United States v. Ponder*, 29 M.J. 782, 783-84 (A.C.M.R. 1989); *Wright v. United States*, 2 M.J. 9, 10-11 (C.M.A. 1976). Finally, we will exercise our discretion under Article 66(d)(1), UCMJ, and Rule for Courts-Martial [R.C.M.] 1101(e)(2) to modify the Statement of Trial Results Findings Worksheet to reflect that The Charge alleged a violation of "128", which is currently omitted. We further correct the Judgment of the Court, dated 11 August 2024, to include an "ACCA Case Number" of "20240334".

During the providence inquiry, appellant explained to the military judge that he heard the correctional officer ask him what was in his hand while appellant stood at the toilet, to which appellant replied, "my privates." Appellant then felt a pressure on his back and a hand near his shoulder and neck, which he turned to face, striking the correctional officer's face with his arm. Appellant admitted that he knew it was a correctional officer. However, due to his twenty years of combatives training, appellant claimed he instinctively performed a combative move any time someone approached his back, neck, or shoulder area to protect himself. In this instance, appellant responded with "combat speed . . . literally, like, a muscle memory." Appellant admitted the combative move had a high chance of harming or making unwanted contact to the person behind him. The defense asked for a brief recess. Before granting the request, the military judge advised counsel he believed self-defense had been reasonably raised by appellant's statements about protecting himself and that he planned to discuss the defense with appellant when they returned.

After the recess, the military judge read the definition of self-defense to appellant and asked him whether he believed he was acting in self-defense. When appellant again referred to his training, the military judge then explained to appellant that his belief must have been objectively reasonable:

> MJ: And so, would the average person under that exact same circumstance think that physical harm is about to be inflicted on them[?]
>
> ACC: I think that my experiences and my knowledge may have skewed me from, like, a regular layman, like, to where anything that actually approaches my neck or my shoulder area is perceived to me as a choke, especially if it comes from the rear. I immediately go into a protect my neck. So my training may have skewed my – what another person, a layman, would have actually – because any contact to your neck or shoulder area from the rear is perceived as an attack to you.
>
> MJ: So you had, let's say, a heightened sensitivity.
>
> ACC: Yes, sir.
>
> . . .
>
> MJ: [D]o you believe that the average reasonable person in that circumstance would not have perceived that physical

3

harm is about to be inflicted on them, but you did because of your heightened sensitivity?

ACC: I think a regular person walking down the street wouldn't, but anybody with combatives experience would have.

The military judge then turned to the second element of self-defense, whether appellant believed the amount of force he used was required to protect himself. Appellant again referred to his combatives training and explained that when the correctional officer touched him, appellant's instinct was to turn his head, squat down, and bend over such that his "right buttocks actually lifted [the correctional officer] up a little bit" such that he could "feel him hanging on [appellant's] back." Appellant then turned into the correctional officer. "I do it instinctively. So, I don't even know I did it." Appellant perceived the correctional officer was putting him in a chokehold. "Would I have used less force, I would not have, sir."

Appellant admitted that the correctional officer was in the execution of his duties at the time of the assault and was authorized to restrain appellant. Appellant also admitted that while the correctional officer could touch appellant, the appellant, as an inmate, was not authorized to touch the correctional officer.

Defense requested to take another recess. During the recess, the military judge met with counsel in an R.C.M. 802 session to further discuss the applicability of self-defense in appellant's case. When they returned, the military judge asked appellant a series of questions about his experience as an inmate for the last nine years, the correctional officer's authority to restrain an inmate, and whether appellant believed the amount of force he used was necessary under the second element of self-defense. While some of the military judge's questions could be characterized as leading, not all of appellant's answers were a simple "yes" or "no."

MJ: And so certainly you used more force in turning around and moving your arm, and where you said you struck the [correctional officer] with your arm, you used a lot more force in doing that than was used on you. Is that fair?

ACC: Yes, sir.

MJ: Okay. And is that what happened? I mean; is that correct?

ACC: I'm a bigger guy so of course I use more – I was able to use more force . . . .

4

The military judge advised appellant that the defense of self-defense did not apply if he was the aggressor. When the military judge asked appellant to confirm that he was the aggressor, appellant responded:

> ACC: I would say the causation, I was the actual cause of him being there. And that once I felt what I perceived to be a chokehold, I actually used whatever force it was to get him off of me. So, if that qualifies as being aggressor then okay.

The military judge again asked if appellant had an opportunity to discuss the defense of self-defense with his defense counsel. Appellant replied in the affirmative and that he did not believe the defense applied.

> ACC: So they explained to me basically since [the first correctional specialist] precipitated the actual encounter with [the second correctional officer], me being the aggressor in one and it being basically on the corresponding with that actual first assault of Specification 2, it was basically I didn't have the right to self-defense at that point.

> MJ: Okay. But after your discussion with your counsel, you have determined that you don't believe it applies to your case.

> ACC: Yes, sir, I do not.

Appellant now argues on appeal that his guilty plea to Specification 1 of The Charges is improvident because the military judge failed to sufficiently resolve the inconsistency that appellant believed he was acting in self-defense.

## LAW AND DISCUSSION

### A. Standard of Review and Applicable Law

#### 1. The Guilty Plea

We review "'questions of law arising from a guilty plea de novo'" and "a military judge's acceptance of a guilty plea for abuse of discretion." *United States v. Saul*, 86 M.J. 30, 33 (C.A.A.F. 2025) (first quoting; and then citing *United States v. Inabinette*, 66 M.J. 320, 322 (C.A.A.F. 2008)). "The test for an abuse of discretion is whether the record shows a substantial basis in law or fact for questioning the plea." *United States v. Schell*, 72 M.J. 339, 345 (C.A.A.F. 2013) (citing *Inabinette*, 66 M.J. at 322).

Article 45(a), UCMJ, requires a military judge to reject a plea of guilty if an accused "sets up matter[s] inconsistent with the plea, or if it appears he has entered the plea of guilty improvidently." If presented with an inconsistency at any point during the proceedings, "the military judge must either resolve the apparent inconsistency or reject the plea." *United States v. Garcia*, 44 M.J. 496, 498 (C.A.A.F. 1996). If the military judge "neglects or chooses not to resolve an inconsistency or reject the inconsistent or irregular pleading," then he has abused his discretion. *Schell*, 72 M.J. at 345 (citation omitted); *see also Saul*, 86 M.J. at 33 (stating an appellate court will not reverse the guilty finding "'unless it finds a substantial conflict between the plea and the accused's statements.'" (quoting *Garcia*, 44 M.J. at 498)).

"Military judges often can 'resolve' apparent inconsistencies by asking the accused questions and receiving answers that show no actual inconsistency exists." *Saul*, 86 M.J. 30 at 33 (citation omitted). The plea's factual predicate, however, must be established "as revealed by the accused himself." *United States v. McCrimmon*, 60 M.J. 145, 152 (C.A.A.F. 2004) (internal quotation marks omitted) (citation omitted); *see also* R.C.M. 910(e) discussion (stating "the accused must be convinced of, and able to describe all the facts necessary to establish guilt."). Thus, the use of leading question during the providence inquiry, while not impermissible, "is disfavored." *United States v. Nance*, 67 M.J. 362, 366 (C.A.A.F. 2009) (citation omitted); *see also United States v. Negron*, 60 M.J. 136, 143 (C.A.A.F. 2004) ("We find little benefit in establishing a factual record where as here Appellant merely is 'parroting' responses to leading questions asked by the military judge.").

"To rise to the level of inconsistency contemplated by Article 45(a), matters raised at trial must have reasonably raised the question of a defense or must have been inconsistent with the plea in some respect." *United States v. Goodman*, 70 M.J. 396, 399 (C.A.A.F. 2011) (citation omitted). So, while not every inconsistency requires rejection of a guilty plea, an affirmative defense to a charged offense would, by definition, constitute a matter inconsistent with a plea of guilty that the military judge must resolve or reject the plea. *United States v. Hayes*, 70 M.J. 454, 458 (C.A.A.F. 2012). To determine whether there is a substantial inconsistency, "this Court considers the 'full context' of the plea inquiry, including Appellant's stipulation of fact." *Goodman*, 70 M.J. at 399 (citation omitted). The "mere possibility of conflict" is not enough. *United States v. Prater*, 32 M.J. 433 (C.M.A. 1991) (quoting *United States v. Logan*, 22 U.S.C.M.A 349, 351, 47 C.M.R. 1, 3 (1973 )).

In reviewing a providence inquiry, we must also be mindful that:

> self-serving rationalization or equivocations on the part of an accused do not necessarily violate a plea of guilty when those assertions do not indicate ignorance or

> misunderstanding and can be construed consistent with guilt. It is a common reaction of an accused who tenders a guilty plea to seek refuge in a variety of forms of rationalization designed to minimize or temper the magnitude of his culpability.

*United States v. Young*, 2 M.J. 472, 476-77 (A.C.M.R. 1975).

And "although sometimes the rationalization is 'inconsistent with the plea,' more often than not it is an effort by the accused to justify his misbehavior." *Goodman*, 70 M.J. at 400 (quoting *United States v. Penister*, 25 M.J. 148, 153 (C.M.A. 1987) (Cox, J., concurring)).

### 2. Self-Defense

Self-defense is a complete defense to the offense of assault under Article 128, UCMJ. R.C.M. 916(a), (e)(3). For self-defense to exist, an accused must have:

> (1) Apprehended, upon reasonable grounds, that bodily harm was about to be inflicted wrongfully on the accused; *and*
>
> (2) Believed that the force that the accused used was necessary for protection against bodily harm, provided that the force used by the accused was less than force reasonably likely to produce death or grievous bodily harm.

R.C.M. 916(e)(3) (emphasis added).

Thus, self-defense consists of two elements, both of which must be satisfied for the defense to apply. Both of these elements have a subjective component: that is, the appellant must actually have apprehended the threat and must actually have believed the force he used was necessary to counter that threat. But the first element also "has an objective component, involving the perception of a reasonable person under the circumstances." *United States v. Dobson*, 63 M.J. 1, 11 (C.A.A.F. 2006). Thus, to satisfy the first element, appellant's apprehension of bodily harm must not only be subjectively held but also must "be one which a reasonable, prudent person would have held under the circumstances." *United States v. Bradford*, 29 M.J. 829, 832 (A.C.M.R. 1989). Consequently, the factfinder, in determining whether the apprehension of bodily harm was reasonable, may consider "objective indicators such as height, weight, and general build of [the accused and the victim] and the possibility of a safe retreat by the accused." *Id.* at 832-33. The factfinder, however, should not consider subjective characteristics, such as an accused's "[i]ntoxication or emotional instability." *Id.* at 833.

Whereas the first element of self-defense has an objective component, the second element—whether the appellant believed the force used was necessary—is "entirely subjective" in nature. *See* R.C.M. 916(e) discussion. "This element is personal to the accused. It is what he believes." *United States v. Jackson*, 15 U.S.C.M.A. 603, 608, 36 C.M.R. 101, 106 (1966) (we look at the situation "'through the eyes of the accused.'") (citation omitted)). Thus, for this second element, "such considerations as an accused's emotional control, education, and intelligence are relevant in considering the accused's actual belief as to the amount of force necessary to repel the attack." *Bradford*, 29 M.J. at 833 (citation omitted).[4]

"The right to act in self-defense, however, is not absolute." *United States v. Behenna*, 71 M.J. 228, 233 (C.A.A.F. 2012), cert. denied, 569 U.S. 1017 (2013). Under R.C.M. 916(e)(4), an accused loses the right to self-defense if he "was an aggressor, or engaged in mutual combat, or provoked the attack which gave rise to the apprehension, unless the accused had withdrawn in good faith after the aggression, combat, or provocation and before the offense alleged occurred." *See also Behenna*, 71 M.J. at 233 (stating an initial aggressor regains the right to act in self-defense if he "withdraws in good faith and communicates that intent to withdraw." (citation omitted)).

*B. Discussion*

The military judge, here, used open-ended questions throughout the providence inquiry to establish the factual predicate for the underlying charged offenses. He appropriately asked clarifying questions and when presented with a potential inconsistency—the right to self-defense—the military judge properly advised appellant of the elements of self-defense, ensured appellant had discussed the defense with his counsel, and questioned appellant thoroughly about whether he believed it applied to the facts of his case.

Appellant clearly articulated, in his own words, that the first element of self-defense was not satisfied: that "a regular person walking down the street" would not have perceived that physical harm was about to be wrongfully inflicted. While

---

[4] Our precedent appears to create a distinction between an accused's personal characteristics that are primarily physical in nature–height, weight, and build, for example–from those personal characteristics that are mental in nature–emotional control, intoxication, education. The characteristics which are more physical in nature are considered in determining whether the accused's belief was reasonable under the circumstances: that is, whether a reasonable person of the same height, weight, and build of the accused would have apprehended that bodily harm was about to be inflicted. In contrast, those characteristics that are mental in nature are not considered in answering this question. They are relevant, however, to the subjective element of self-defense and the accused's actual belief.

certain characteristics of appellant were relevant to the objective circumstances—his height, weight, and general build—appellant's combatives training under the facts of this case was not. Appellant's combatives training gave him a heightened sensitivity to respond instinctively to certain touches, which a "reasonable person" would not.[5] Thus, this characteristic was personal to the accused and like emotional instability, intelligence, and education, was relevant only to the subjective component of self-defense. As the military judge explained to appellant, the objective component to the defense required appellant's apprehension of harm to be reasonable. In answer to the military judge's questions to this first element of the defense, appellant admitted that while a person with combatives experience, like himself, would have perceived a threat, "a regular person walking down the street" would not have. Thus, appellant unequivocally disclaimed the first element of self-defense. And because both elements must be satisfied, the defense, as a whole, did not apply to appellant's case. A fact of which appellant's defense counsel correctly advised appellant and which appellant acknowledged.

The military judge continued to question appellant about the second element of self-defense. Despite the military judge's questions, appellant never truly admitted that he believed the force he used was unnecessary. To the contrary, because appellant subjectively perceived he was about to be put in a chokehold based on his extensive combatives training, appellant was adamant he would not have used less force. Thus, we agree with our colleague that there was an insufficient factual predicate to support appellant's belief for the second element of self-defense. This belief, however, was not necessary for appellant to be provident. Because both elements must be met for the defense to apply and appellant had already admitted, in his own words, that his apprehension of the threat was not reasonable, the defense was inapplicable to Specification 1 of The Charge.

While appellant repeatedly stated that he "perceived" the correctional officer's actions as a chokehold, he never stated that the correctional officer actually put him in a chokehold. Rather, appellant stated, this perception was based on his heightened sensitivity from his twenty years of combatives training. And appellant's subjective belief was not relevant to the objective element of self-defense. Because this subjective belief was not relevant to whether his apprehension of bodily harm was reasonable, appellant's statements about *his* perception, as opposed to that of a

---

[5] One could argue that an accused's extensive combatives or martial arts training is more akin to a physical attribute such as an accused's build. We need not decide that question, however, because it was not presented here. In this case, appellant stated his combatives training gave him a heightened sensitivity to certain touches that affected his perception, which would not have been shared by a reasonable person without combatives training. Appellant's statements during the providence inquiry reflected that the relevance of his combatives training was purely subjective in nature.

reasonable person, did not create an inconsistency with his previous admissions. Additionally, looking at the providence inquiry, as a whole, we can see that appellant's answers that he "perceived" he was being put in a chokehold were in response to the military judge's questions about the second element of self-defense, not the first element. Thus, we find appellant's intractable statements concerning the second element of self-defense did not render his guilty plea improvident.[6]

We also do not find that the military judge was required to advise appellant of the opportunity to withdraw under R.C.M. 916(e)(4), because it was not reasonably raised under the facts as appellant articulated them. Appellant's counsel and the military judge both appropriately advised appellant that the right to self-defense was lost if he was an aggressor. Under R.C.M. 916(e)(4), however, even if an accused is an aggressor (or involved in a mutual fray), the right to self-defense is not lost if the accused later withdraws in good faith before a subsequent attack from an assailant. This, however, was not a mutual fray. The correctional officer was not an assailant. Rather, he was a law enforcement officer, who in the exercise of those lawful duties, was attempting to restrain appellant. That is not to say that a law enforcement officer can never be an assailant, only that the facts articulated by appellant did not indicate that the correctional officer was acting as an assailant, that is -- attacking or assailing appellant.

Rather, appellant's admissions indicated the correctional officer was acting lawfully. By analogy, a military judge would not be required to advise an accused charged with resisting apprehension in violation of Article 87a, UCMJ, on the opportunity to withdraw from said apprehension, if it was lawful. Fleeing from apprehension is not a defense to resisting apprehension when the apprehension is lawful. Similarly, appellant's walking away from the correctional specialist's lawful attempts to stop him did not justify appellant's subsequent assault of the correctional officer in the latrine. We acknowledge that appellant was not charged with a violation of Article 87a, UCMJ, to which self-defense does not apply. We simply use this as an analogy to help illustrate why the opportunity to withdraw was not reasonably raised based on the facts as articulated by appellant.

Appellant admitted that he knew it was a correctional officer behind him when he heard him ask what was in appellant's hands, even before he felt the correctional officer touch him. Appellant further acknowledged that correctional specialists and officers had the authority to restrain inmates, such as appellant. Although the

---

[6] We note that there appears to be an inconsistency between appellant's statement that the time between the two assaults was several minutes as opposed to several seconds reflected in the close circuit television video recording admitted at trial. In response to the military judge's questions, however, the appellant admitted the second assault occurred on the heels of the first assault. We find any inconsistency in appellant's statement was not substantial to render appellant's plea improvident.

correctional officer's grip caused appellant to urinate over the toilet, appellant never articulated facts indicating that the correctional officer's use of force was excessive or unlawful or that he had acted in a manner that divested himself of his law enforcement authority. While appellant repeatedly stated that based on his extensive combatives training, he subjectively perceived the correctional officer's actions as a chokehold, appellant never stated that the correctional officer actually put him in a chokehold.

Thus, because this was neither a mutual fray nor an attack from an assailant, but the lawful use of force from a correctional officer in the exercise of his official duties, we do not find that the opportunity to withdraw was reasonably raised by appellant's providence inquiry. The mere possibility of a defense is not enough to raise an inconsistency in an appellant's plea. Because withdrawal was inapplicable, the military judge was not required to advise appellant of it and no additional inquiry was necessary. *See e.g.*, *United States v. Rios*, 33 M.J. 436, 441 (C.M.A. 1991) (stating additional inquiry was not required where the defense of voluntary abandonment, as a matter of law, did not apply). Consequently, we find the military judge did not abuse his discretion in accepting appellant's plea of guilty.

## CONCLUSION

The findings of guilty and the sentence are AFFIRMED.

Chief Judge FLOR concurs.

ARGUELLES, Judge, dissenting:

I respectfully disagree with the majority's conclusion that appellant was provident in his guilty plea to Specification 1 of The Charge. To the contrary, because the military judge failed to sufficiently resolve the inconsistencies between appellant's providence inquiry and his guilty plea, the guilty verdict must be set aside.

### A. Additional Facts

As noted in the majority opinion, during a routine frisk search that a correctional specialist performed as appellant left the dining facility at the United States Disciplinary Barracks, the correctional specialist observed that appellant, an inmate, had both hands clenched. Disobeying the correctional specialist's order to open and close his hands, appellant instead walked briskly towards the latrine. When the correctional specialist attempted to prevent appellant from opening the bathroom door, appellant forcefully struck the correctional specialist's foot with the door and walked into the latrine. This conduct formed the basis for the second specification, which is not at issue on appeal.

11

Appellant also pleaded guilty to Specification 1, in that he assaulted a correctional officer "by striking [victim] in the face with [appellant's] arm." Specifically, after entering the latrine, appellant was standing and urinating at a toilet when a second correctional officer approached him from behind, placing one hand on appellant's right neck and shoulder area and the other on his hip. During his plea colloquy, appellant explained that due to his combative training, he instinctively turned around "to try to keep anything off of [his] neck" and "get the whatever off [his] neck and face it." Given the confined nature of the bathroom stall, appellant admitted he struck the correctional officer's face with his arm when he turned around.

Based on appellant's responses, about halfway through the plea colloquy, the military judge took a thirty-one-minute recess to allow appellant to discuss the applicability of self-defense with his counsel. When they came back on the record, the military judge asked appellant if he could have avoided assaulting the second correctional officer, to which appellant responded that when he felt the pressure on his neck and back, "I was going to actually protect myself and turn around and face them." Appellant further added that his only other option would "be just to let him do whatever I perceive that he was going to do, and that was not going to be an option for me."

When asked whether he thought a reasonable person in his circumstances would have perceived they were about to suffer harm, appellant initially stated, "I think a regular person walking down the street wouldn't, but anybody with combatives experience would have." Appellant further described, however, that based on the grip that the correctional officer had when "he grabbed my neck and shoulder," "I loaded him up, which gave me another sense of him on my back, and turned into him."

When asked whether he believed he used more force than that required to protect himself, appellant's response was "No, sir." When the military judge asked appellant if he acted in self-defense, appellant replied, "I believe I protected my throat, sir." Finally, although he acknowledged that the correctional officer had the authority to make contact with him and was acting "in the execution of his military law enforcement duties at the time," appellant also made it clear that "the actual issue was that I perceived that he was putting me in a chokehold."

At that point, the military judge met with counsel in chambers to discuss "the application of self-defense." When they returned to the record, the military judge asked a series of leading questions. When the judge asked appellant to confirm that the time period between the two assaults was "a couple of seconds," appellant responded, "I would say probably within minutes, sir." During this portion of the colloquy appellant also explained how the force of the correctional officer's initial contact with him was significant enough to cause him to urinate over the toilet.

When asked by the military judge to confirm that he was the aggressor, appellant responded:

> I would say the causation, I was the actual cause of him being there. And that once I felt what I perceived to be a chokehold, I actually used whatever force it was to get him off of me. So, if that qualifies as being aggressor then okay.

When again questioned by the military judge about the nature of the chokehold, appellant reiterated how the correctional officer's "grab" was "enough force to where when I actually bent down and put him on my hip, he was still hanging on me, so . . . ."

When the military judge then asked appellant if the "average inmate" would have reacted in the same way, appellant did *not* respond in the negative, but rather said "I don't think they would have knew [*sic*] how to get something off their throat," and "I don't think a regular person would actually know how to pivot their hips and turn into the person to get someone off their back."

When the military judge once again attempted to drill down to whether an "average person" would have perceived the correctional officer's actions to be a chokehold, appellant's response was *"maybe not, sir."* (emphasis added). Attempting to wrap up the guilty plea, the military judge had the following exchange with appellant:

> MJ: Okay. And I'll just ask again, you've had an opportunity to discuss the defense of self-defense with your counsel; is that correct?
>
> ACC: Yes, sir.
>
> MJ: I don't I [sic] want to hear what you talked about, but you had an opportunity to talk about that.
>
> ACC: Yes, sir.
>
> MJ: Do you believe that that applies in your case?
>
> ACC: Yes, sir.
>
> MJ: Do you believe that the defense of self-defense applies in your case?
>
> ACC: Yes, sir. Oh, no. No, sir.

> MJ: Would you like to talk to your counsel?
>
> ACC: So they explained to me basically since [the first correctional specialist] precipitated the actual encounter with [the second correctional officer], me being the aggressor in one and it being basically on the corresponding with that actual first assault of Specification 2, it was basically I didn't have the right to self defense at that point.
>
> MJ: Okay. But after your discussion with your counsel, you have determined that you don't believe it applies to your case.
>
> ACC: Yes, sir, I do not.

In response to appellant informing the military judge that his lawyers told him that he lost the right to self-defense in the bathroom stall because he slammed the door on the first correctional specialist's foot, the military judge did not follow up to discuss whether appellant believed he had withdrawn in good faith from the initial confrontation at the bathroom door. This was despite the fact that appellant previously told the military judge that it was a matter of "minutes," rather than "a couple of seconds," that separated the two alleged assaults.

*B. Law*

We review "'questions of law arising from a guilty plea de novo'" and "a military judge's acceptance of a guilty plea for abuse of discretion." *United States v. Saul*, 86 M.J. 30, 33 (C.A.A.F. 2025) (first quoting; and then citing *United States v. Inabinette*, 66 M.J. 320, 322 (C.A.A.F. 2008)). "Once the military judge has accepted a plea as provident and has entered findings based on it, an appellate court will not reverse that finding and reject the plea unless it finds a substantial conflict between the plea and the accused's statements or other evidence of record." *United States v. Garcia*, 44 M.J. 496, 498 (C.A.A.F. 1996).

If an accused "sets up matter inconsistent with the plea" at any time during the proceeding, the military judge must either resolve the apparent inconsistency or reject the plea. *Id.* (quoting UCMJ art. 45(a), UCMJ; Rule for Courts-Martial [R.C.M.] 910(h)(2)). While "[m]ilitary judges often can 'resolve' apparent inconsistencies by asking the accused questions and receiving answers that show no actual inconsistency exists," a military judge abuses his discretion if he fails to resolve such an inconsistency. *Saul*, 86 M.J. at 33; *accord United States v. Hayes*, 70 M.J. 454, 457; *see also United States v. Hartman*, 69 M.J. 467, 468 (C.A.A.F. 2011) ("[T]he colloquy between the military judge and an accused must contain an

appropriate discussion and acknowledgment on the part of the accused of the critical distinction between permissible and prohibited behavior.").

The Court of Appeals for the Armed Forces [CAAF] has held that this duty to resolve inconsistencies also pertains to possible defenses. *See, e.g., United States v. Philippe*, 63 M.J. 307, 310 (C.A.A.F. 2006) ("Even if an accused does not volunteer all the facts necessary to establish a defense, if he sets up matter raising a possible defense, then the military judge is obligated to make further inquiry to resolve any apparent ambiguity or inconsistency." (citing *United States v. Prater*, 32 M.J. 433, 436 (C.M.A. 1991)); *United States v. Outhier*, 45 M.J. 326, 331 (C.A.A.F. 1996) ("Article 45(a) requires that, in a guilty-plea case, inconsistencies and apparent defenses must be resolved by the military judge or the guilty pleas must be rejected. Mere conclusions of law recited by an accused are insufficient to provide a factual basis for a guilty plea." (citations omitted)).

Finally, when reviewing the providence of a guilty plea, we limit our consideration of the "facts" to what appellant states in his providence inquiry and Stipulation of Fact, as opposed to weighing any circumstantial evidence and determining for ourselves what "really happened." *See, e.g. Saul*, 86 M.J. at 34 ("Using permissive inferences is less common in uncontested cases, where the military judge generally must determine from the accused's statements, rather than circumstantial evidence, whether a guilty plea is provident."); *United States v. Lee*, 16 M.J. 278, 281 (C.M.A. 1983) ("The majority opinion in the court below seems to have mistakenly viewed the issue to be whether appellant had raised a defense of impossibility which was plausible or credible. However, in deciding a providence issue, the sole question is whether appellant made a statement during the trial which was in conflict with his guilty plea. It is unnecessary that his statement be credible; instead, it only need be inconsistent.").

With respect to self-defense, I agree with the majority's summary of the law. *See, e.g., United States v. Dobson*, 63 M.J. 1, 11 (C.A.A.F. 2006) ("The first element, under [R.C.M. 916(e)(3)] subparagraph (A), has an objective component, involving the perception of a reasonable person under the circumstances. The second element, under subparagraph (B), is wholly subjective, involving the personal belief of the accused, even if not objectively reasonable.").

### C. Analysis

#### 1. Second Subjective Element of the Self-Defense Test

Starting with the second subjective element of the self-defense test, given appellant's multiple statements about his perception that the correctional officer was attempting to put him in a chokehold, and his firm belief in the justification of his response, appellant satisfied the second subjective element of the self-defense test.

The majority does not dispute this fact. *See supra* ("Thus, we agree with our colleague that there was an insufficient factual predicate to support appellant's belief for the second element of self-defense.")

*2. First Objective Element of the Self-Defense Test*

The majority is correct that in order for the defense of self-defense to apply, *both* the subjective and objective elements of the test must be satisfied. As such, the majority reasons that even if appellant failed to disavow the second subjective element of the test, because he affirmatively stated that an objective person would not have reasonably perceived the necessity to use force in self-defense, this defense did not apply and he was provident in his plea. The record, however, does not support such a conclusion.

The majority posits that because the correctional officer did not actually place appellant in a chokehold, but rather only that appellant merely "perceived" that he was *about* to suffer such harm based on his specific training, any apprehension on his part that "bodily harm was about to be inflicted wrongfully" was not objectively reasonable. But, according to appellant, it was only his actions taken in self-defense that prevented the successful application of the chokehold. As such, the fact that appellant thwarted the correctional officer's effort to apply a chokehold does not by itself render self-defense inapplicable.

Moreover, the majority's analysis ignores the fact that appellant's "perception" that the correctional officer was attempting to put him in a chokehold was based on more than just his mental thought process. To the contrary, appellant stated that his belief that the correctional officer was about to put him in a chokehold was also based on the *physical* actions of the guard. Specifically, appellant testified that: (1) while appellant was urinating, the correctional officer approached him from behind and placed one hand on his right neck and shoulder area and the other on his hip, which caused him to urinate over the toilet; (2) based on the grip that the correctional officer had when "he grabbed my neck and shoulder," and "I loaded him up, which gave me another sense of him on my back, and turned into him[;]" and (3) the correctional officer's "grab" was "enough force to where when I actually bent down and put him on my hip, he was still hanging on me." Appellant's description of the physical actions taken by the correctional officer, including the location and strength of his grip, is far from an acknowledgment or concession on his part that a "reasonable" person would not have perceived the correctional officer's actions to be a threat necessitating self-defense.

In addition, appellant's statements throughout the colloquy about the applicability of the first objective element of the self-defense were inconsistent and conflicting. On the one hand, the majority is correct that early in the colloquy, appellant initially stated that "a regular person walking down the street wouldn't

[reasonably perceive this to be a threat necessitating self-defense] but anybody with combatives experience would have." But, later in the discussion appellant made statements to the contrary that the military judge failed to resolve. For example, when the military judge asked appellant if the "average inmate" would have reacted in the same way, appellant did *not* disavow the applicability of the first element of the self-defense test, but instead explained, "I don't think they would have knew [*sic*] how to get something off their throat." In other words, appellant did *not* say that an "average inmate" or "regular person" would not have perceived he was being placed in a chokehold, but rather only that such an inmate or person would not know how to properly respond to being put in a chokehold, and "would [not] actually know how to pivot their hips and turn into the person to get someone off their back." Finally, when the military judge at the end of the colloquy attempted once again to get appellant to affirm that an "average person" would have perceived the correctional officer's actions to be a "chokehold," the best appellant could say was "maybe not, sir."

As such, the military judge did not sufficiently resolve the inconsistency between appellant's initial statement that a "regular person" would not have apprehended that bodily harm was about to be wrongfully inflicted and his later responses to the contrary, including his response of "maybe not" at the end of the colloquy. "Maybe not" is not just a "rationalization," nor is it sufficient to establish providence to a guilty plea. This is especially true given appellant's other statements about the claimed level of force used by the correctional officer, and the fact that an average person would not have known how to get something off his throat. *See United States v. Jennings*, 1 M.J. 414, 418 (C.M.A. 1976) ("Accepting the accused's version at face value, as we must in determining the providence of his plea, we cannot say that he satisfactorily disclaimed the duress defense.").

The majority further notes that because most of appellant's answers about the chokehold "were in response to the military judge's questions about the second [subjective] element of self-defense, not the first [objective] element. . . . appellant's intractable statements concerning the second element of self-defense do not render his guilty plea improvident." In *Saul*, however, the CAAF rejected such an argument:

> It is true that the discussion of the permissive inference occurred *after* Appellant made his express statements that he did not intend to damage the windshield. But nothing in the record persuades us that Appellant understood the permissive inference to supersede his earlier express statements. And although the military judge and counsel for both sides conscientiously endeavored to find a way to have Appellant establish that he acted with the requisite intent,

17

the military judge could not accept the guilty plea with this substantial inconsistency unresolved.

86 M.J. at 34-35 (emphasis in original).

Finally, the majority's ultimate conclusion that self-defense does not apply because this case involved "the lawful use of force from a correctional officer in the exercise of his official duties" simply does not comport with the facts as described by appellant in his colloquy. Assuming the truth of what appellant told the military judge, as we must in a plea inquiry, a correctional officer who attempts to put an inmate who is urinating and not otherwise resisting into a chokehold does not constitute the "lawful use of force." *Cf.* Press Release, U.S. Dep't of Justice, Department of Justice Announces Department-Wide Policy on Chokeholds and 'No-Knock' Entries (Sept. 14, 2021) ("Under the new policy, the department's law enforcement components will be prohibited from using 'chokeholds' and 'carotid restraints' unless deadly force is authorized, that is 'when the officer has a reasonable belief that the subject of such force poses an imminent danger of death or serious physical injury to the officer or to another person.'").

To be clear, the issue before us in this appeal is *not* whether the correctional officer was actually attempting to place appellant in a chokehold. Nor is it whether a correctional officer who places an inmate in a chokehold in the circumstances as described by appellant is acting in the lawful execution of his military duties. Rather, because the military judge failed to sufficiently address the inconsistencies between appellant's providence inquiry, in which his testimony raised a colorable claim of self-defense, and his guilty plea, appellant was improvident to the first specification. *See Hartman*, 69 M.J. at 469 ("[T]he colloquy between the military judge and an accused must contain an appropriate discussion and acknowledgment on the part of the accused of the critical distinction between permissible and prohibited behavior."); *Saul*, 86 M.J. at 35 ("Because a substantial inconsistency between Appellant's plea and his express statements was not resolved, Article 45, UCMJ, required the military judge to enter a plea of not guilty.").

### 3. *Withdrawal defense*

In addition to failing to resolve the substantial inconsistencies pertaining to the objective element of the self-defense test, the military judge also failed to sufficiently follow up after appellant specifically raised the issue of a potential withdrawal defense. *See* R.C.M. 916(e)(4) (an accused loses the right to self-defense if he was the aggressor or provoked the attack which gave rise to the apprehension, "unless the accused had withdrawn in good faith after the aggression, combat, or provocation and before the offense alleged occurred."); *United States v. Behenna*, 71 M.J. 228, 233 (C.A.A.F. 2012) (An initial aggressor regains the right to

act in self-defense if he "withdraws in good faith and communicates that intent to withdraw." (citation omitted)).

As noted above, at the end of his long plea colloquy, appellant finally agreed that his actions did not constitute lawful self-defense because his counsel told him that since he was the aggressor in the first assault [slamming the door on the correctional officer's foot], he had no right to self-defense in the second assault in the latrine stall. Once appellant told the military judge that his counsel advised him the withdrawal defense did not apply, at a minimum, the military judge had an obligation to ensure that appellant understood both the prerequisites for such a defense and, specifically, why it was or was not applicable. *See Outhier*, 45 M.J. at 331 ("Mere conclusions of law recited by an accused are insufficient to provide a factual basis for a guilty plea." (citation omitted)).

That is especially true in this case, given appellant's assertion that several minutes passed after the initial assault at the door, the fact that appellant was urinating with his penis in his hand, and the fact that the second correctional officer approached and grabbed appellant from behind while he was in the stall and without any verbal warning. In failing to conduct *any* follow-up with appellant, the military judge clearly erred. *See Philippe*, 63 M.J. at 310 ("Even if an accused does not volunteer all the facts necessary to establish a defense, if he sets up matter raising a possible defense, then the military judge is obligated to make further inquiry to resolve any apparent ambiguity or inconsistency.").

Again, the question before us is *not* how much time actually elapsed between appellant's interaction with the first and second guards, or even whether a meritorious withdrawal defense exists in this case. *See Lee*, 16 M.J. at 281 ("[I]n deciding a providence issue, the sole question is whether appellant made a statement during the trial which was in conflict with his guilty plea. It is unnecessary that his statement be credible; instead, it only need be inconsistent."). Once again, because the military judge failed to sufficiently address the inconsistencies between appellant's providence inquiry, in which his testimony raised a colorable withdrawal defense, and his guilty plea, appellant was improvident to the first specification. *See Hartman*, 69 M.J. at 469; *Saul*, 86 M.J. at 35.

Finally, and along the same lines, the majority's analogy to an assailant fleeing law enforcement is an incomplete hypothetical. A more appropriate "fleeing" hypothetical would involve an accused who initially flees law enforcement, but after several minutes following his initial flight, subsequently makes clear through his actions that he is "withdrawing" and giving up, but nevertheless is subjected to a chokehold by the pursuing officer. In such a factual scenario, it would be a clear error for the military judge not to follow up with appellant to determine both that he fully understood the withdrawal defense, and why specifically he was disavowing such a defense.

*D. Remedy*

It is well-established that "[a] pretrial agreement in the military justice system establishes a constitutional contract between the accused and the convening authority." *United States v. Smead*, 68 M.J. 44, 59 (C.A.A.F. 2009) (citing *United States v. Lundy*, 63 M.J. 299, 301 (C.A.A.F. 2006)); *see also United States v. Acevedo*, 50 M.J. 169, 172 (C.A.A.F. 1999) ("A pretrial agreement is created through the process of bargaining, similar to that used in creating any commercial contract. As a result, we look to the basic principles of contract law when interpreting pretrial agreements." (citations omitted)).

As part of his written plea agreement in this case, appellant agreed that the convening authority could withdraw "[i]f findings are set aside because my plea of guilty pursuant to this agreement was held improvident on appellate review." Likewise, R.C.M. 705(e)(4)(B) provides:

> The convening authority may withdraw from a plea agreement . . . if findings are set aside because a plea of guilty entered pursuant to the agreement is held improvident on appellate review.

Put simply, under the plain language of R.C.M. 705(e)(4)(B), once a finding or findings[7] have been set aside as improvident, as is the case here, the convening authority may withdraw from the plea agreement and proceed anew on all of the charges and specifications, including those to which appellant entered improvident guilty pleas at the first trial. As our sister court recently held:

> [I]n cases involving a plea agreement, and depending on the terms of the plea agreement, successfully challenging a plea as improvident on appeal can have the same effect as if the military judge had not accepted the plea in the first place, which is often an express basis for cancellation of the agreement. The plea agreement in this case contains a similar provision in the event Appellant failed to plead guilty. But it also contains an express provision allowing the Government to withdraw from the plea agreement "if [the] findings are set aside because a plea of guilty is held improvident on appellate review."
> Setting aside the findings and sentence places the parties in exactly the position contemplated by Rule for Courts-

---

[7] The "number canon" directs that the singular includes the plural and vice versa. *See United States v. Kibler*, 84 M.J. 603, 611-12 (Army Ct. Crim. App. 2024) (Arguelles J., dissenting).

> Martial 705(e)(4), where both parties may now withdraw from the plea agreement or elect to proceed under the previous agreement.

*United States v. Moore*, 84 M.J. 695, 702-03 (N.M. Ct. Crim. App. 2024) (second alteration in original); *see also United States v. Cook*, 12 M.J. 448, 455 n.11 (C.M.A. 1982) ("In the unusual case, where the accused succeeds on appeal in getting his guilty plea vacated, we see no reason to strain the spirit of an agreement to benefit one party, when that party has caused the other to lose its benefit of the bargain.").

Based on both the terms of appellant's plea agreement and the plain language of R.C.M. 705(e)(4)(B), a finding that appellant was improvident to Specification One would trigger the condition allowing the convening authority to withdraw from the entire plea agreement. *See Moore*, 84 M.J. at 703 ("Setting aside the findings and sentence places the parties in exactly the position contemplated by Rule for Courts-Martial 705(e)(4) . . . .").

Accordingly, if appellant's guilty plea to Specification 1 was improvident, the appropriate remedy would be to set aside both of the guilty findings and the sentence, and remand for further proceedings to allow the parties to determine whether they will enter into a new plea agreement or instead proceed to trial on all the charged specifications. *See United States v. Stout*, ARMY 20120592, 2018 CCA LEXIS 174, at *8-9 (Army Ct. Crim. App. 9 Apr. 2018) (mem. op.), aff'd on other grounds, 79 M.J. 168 (C.A.A.F. 2019) ("This decision by the [convening authority] in withdrawing from the [pretrial agreement] 'was to place the parties in the pretrial status quo ante.'" (quoting *United States v. Von Bergen*, 67 M.J. 290, 293 (C.A.A.F. 2009))); *Saul*, 86 M.J. at 35 (holding that if the military judge enters a plea of not guilty because appellant is not provident, "[t]he Government then could have decided whether to proceed to trial, at which a court-martial might or might not have found circumstantial evidence sufficient to prove beyond a reasonable doubt that Appellant acted willfully and wrongfully even if Appellant were to testify [to the contrary].").

FOR THE COURT:

JAMES W. HERRING, JR.
Clerk of Court

21